**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

JOE WILLIE CANNON, JR.,

      Plaintiff,

vs.

KRISTOFFER KARBERG, Anamosa
State Penitentiary Warden, et al.,

      Defendants.

Case No. 21-CV-118-KEM

**MEMORANDUM OPINION**
**AND ORDER**

---

# TABLE OF CONTENTS

I.    *MOTION TO STRIKE* ............................................................... 2

II.   *MOTION FOR SUMMARY JUDGMENT* ............................................. 6

  A.  *Background* .................................................................... 6

  B.  *Discussion* .................................................................... 14

    1.   *Failure to Exhaust* ..................................................... 15

    2.   *Physical Injury* ........................................................ 19

    3.   *Nurse Friedman* ........................................................ 21

    4.   *Deliberate Indifference* .............................................. 22

      i.   *Nurse Friedman and Nurse Devaney* ...................... 25

      ii.  *Nurse Shipley* .................................................. 27

      iii. *Dr. Dehner* ...................................................... 30

    5.   *Qualified Immunity* .................................................. 32

III.  *CONCLUSION* ................................................................... 33

Plaintiff Joe Willie Cannon Jr. broke his wrist while incarcerated in the Anamosa State Penitentiary. He alleges that delays in treatment amounted to deliberate indifference

of a serious medical need in violation of his Eighth Amendment rights and brings a deliberate-indifference claim against various prison employees under 42 U.S.C. § 1983.

Defendants move for summary judgment. Doc. 27. Cannon partially resists and also moves to strike an affidavit Defendants submitted in support of their motion. Docs. 43, 44. I **grant** the motion for summary judgment **to the extent it is unresisted and otherwise deny** the motion. Doc. 27. I **grant** the motion to strike **in part and deny** it **in part**. Doc. 43.

## I. MOTION TO STRIKE

In connection with their motion for summary judgment, Defendants submitted an affidavit from registered nurse Tasha Rooks, the nursing administrator for the Iowa Department of Corrections. Def. App. 10-14.[1] Rooks did not treat Cannon in connection with his claim in this case, but she reviewed his medical records. *Id.* Her affidavit sets out Cannon's past health conditions and the prison's infirmary policy and summarizes Cannon's treatment related to his claim in this case. *Id.* She also opined that medical staff "provided Cannon with appropriate and timely medical care which met medical standards of care." *Id.*

Cannon moves to strike Rooks's affidavit. Doc. 43. Cannon notes Defendants did not provide the necessary expert disclosures by the deadline to allow Rooks to offer expert testimony. *Id.* And Rooks simply reviewed the medical records and lacks personal knowledge of Cannon's treatment. *Id.* Cannon does not object to the admission of the medical records attached to Rooks's affidavit, however. Doc. 51.

Defendants respond that Rooks is a fact witness, not an expert witness. Doc. 50. They argue that as the supervisor of all nursing staff within the Iowa Department of

---

[1] "Def. App." refers to the Defendants' Appendix, filed at Docs. 27-3, 29, and 29-1. "Pl. App." refers to Plaintiff's Appendix, filed at Docs. 39-1 and 39-2. "S. Pl. App." refers to Plaintiff's Sealed Appendix, filed at Docs. 42 to 42-3.

2

Corrections, she has personal knowledge of nursing staff's duties and responsibilities. *Id.* Even if Rooks's opinions that Defendants' actions met medical standards of care constitutes expert testimony, Defendants argue only that portion of Rooks's affidavit should be stricken. *Id.* And although Rooks lacks personal knowledge of Cannon's treatment in this case, Defendants argue it is sufficient that Rooks has "personal knowledge regarding the delivery of health care to inmates in the Iowa prison system" by nature of her employment. *Id.*

Affidavits or declarations submitted in support of a summary judgment motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."[2] Similarly, under Federal Rule of Evidence 602, nonexpert witnesses "may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."

Cannon relies on *Kemp v. Balboa*[3] to support that Rooks lacks personal knowledge of Cannon's treatment. In that deliberate-indifference case, plaintiff's medical records were inadmissible based on defendant's discovery violations.[4] Nevertheless, the trial court allowed a prison nurse to testify about plaintiff's medication usage based on those records by refreshing recollection.[5] The Eighth Circuit held this was error.[6] The testifying nurse had not been "on duty on the days on which she stated [plaintiff] failed to pick up his medication" and instead testified based on "what she had read in the medical

---

[2] **Fed. R. Civ. P. 56(c)(4)**.

[3] 23 F.3d 211 (8th Cir. 1994).

[4] *Id.* at 212.

[5] *Id.* at 212-13.

[6] *Id.* at 213.

records prepared by others."[7]  Thus, the court held "she had no personal knowledge of these facts" and "no recollection that was capable of being refreshed."[8]

Here, as in *Kemp*, Rooks did not treat Cannon and has no personal knowledge of his treatment without relying on his medical records.  But unlike in *Kemp*, there is no dispute that the underlying medical records are admissible here, and Rooks is a proper custodian (to lay foundation for admissibility, a records custodian "need not have personal knowledge regarding the creation of the document offered[] or personally participate in its creation").[9]  District courts in the Eighth Circuit have declined to strike a custodian's declaration summarizing information in business records, noting personal knowledge can be "acquired through review of records prepared in the ordinary course of business."[10]  Rooks lacks personal knowledge to explain Cannon's treatment beyond what appears in the medical records, however.[11]  And as *Kemp* demonstrates, the underlying medical records must be admissible and included to support Rooks's statements.

---

[7] *Id.*

[8] *Id*.

[9] *Brawner v. Allstate Indem. Co.*, 591 F.3d 984, 987 (8th Cir. 2010) (quoting *Resolution Trust Corp. v. Eason,* 17 F.3d 1126, 1132 (8th Cir. 1994)).

[10] *Liquid Cap. Exch., Inc. v. BDC Grp., Inc.*, No. 20-CV-89 CJW-MAR, 2021 WL 6144654, at *3 (N.D. Iowa Nov. 19, 2021) (quoting *Eckelkamp v. Beste*, 315 F.3d 863, 872 (8th Cir. 2002)); *see also East v. Dooley*, No. 4:19-CV-04126-RAL, 2020 WL 5816248, at *1-2 (D.S.D. Sept. 30, 2020), *aff'd,* 847 F. App'x 359 (8th Cir. 2021); *Maday v. Dooley*, No. 4:17-CV-04168-KES, 2019 WL 4935705, at *48-51 (D.S.D. Mar. 8, 2019), *report and recommendation adopted as modified,* 2019 WL 4747058 (Sept. 30, 2019), *opinion corrected on denial of reconsideration sub nom. Maday v. Pierre*, 2020 WL 4904055 (Aug. 20, 2020); *Brown v. Richards*, No. 17-6080-CV-SJ-HFS-P, 2018 WL 10400001, at *1-2 (W.D. Mo. Dec. 10, 2018).

[11] *Cf. Liquid Cap. Exch.*, 2021 WL 6144654, at *3-5 (noting custodian could testify as to contents of business records, such as what terms appeared in the contract, but striking portions of custodian's affidavit based on inferences from those records, including meaning of terms in the contract, based on lack of personal knowledge).

4

Rooks's affidavit does not cite to medical records nor specify from where she obtained particular treatment information. For example, Rooks avers to treatment Cannon received on August 2, 2020, but there are no medical records from this date. Rooks claims to have acquired personal knowledge from review of the depositions and Cannon's Grievances in this case, but no evidence establishes that she is the proper custodian of these kinds of records, and they are not included as attachments to her affidavit. In addition, I agree with Cannon that Rooks's opinions on whether Cannon's treatment met the standard of care are untimely expert opinions unsupported by personal knowledge (and I further note that Defendants cite no cases illustrating otherwise).[12]

To avoid relying on portions of Rooks's affidavit unsupported by personal knowledge, I agree with Cannon that Rooks's affidavit should largely be stricken, and the medical records relied on instead. I do find, however, that Rooks has personal knowledge of the prison infirmary's hours and policies by nature of her employment as the administrator of nursing, and I therefore decline to strike paragraph 6 of the affidavit.

---

[12] Plaintiff cites several cases in support of this proposition. *See Stowell v. Huddleston*, 643 F.3d 631, 633, 635 (8th Cir. 2011) (affirming district court's finding that ophthalmologist "was not qualified to offer expert opinion on the applicable standard of care" for orthopedic spine surgeries); *Romero v. Hanisch*, No. CV 08-5040-JLV, 2010 WL 5020657 (D.S.D. Dec. 3, 2010) (addressing whether pharmacist was qualified to provide expert testimony on the standard of care for doctors in monitoring prescribed drugs); *Kistner v. SSM Health Care of St. Louis*, No. 4:05 CV 1335 DDN, 2006 WL 8459039 (E.D. Mo. Dec. 5, 2006) (holding that nurse's and pharmacist's opinions on standard of care applicable to doctors were expert opinions they were not qualified to give; and allowing supplementation of doctor's expert report when the supplementation did not provide new information and simply "clarifie[d] his opinion about the standard of care . . . by using the phrase 'standard of care'"); *see also Moore v. Duffy*, 255 F.3d 543, 545 (8th Cir. 2001) (noting that to establish deliberate indifference based on deviation from standard of care, "[o]ften whether such a significant departure from professional standards occurred is a factual question requiring expert opinion to resolve"); *Csiszer v. Wren*, No. 08-3011, 2009 WL 10707836, at *3-4 (W.D. Ark. Feb. 5, 2009) (granting motion in limine in medical-malpractice action preventing lay witnesses "from testifying as to their opinion of the medical care or treatment provided . . . , as testimony on the standard of care . . . must be given by a qualified expert").

5

Cannon's motion to strike (Doc. 43) is **GRANTED IN PART AND DENIED IN PART**.

## II.     *MOTION FOR SUMMARY JUDGMENT*

### A. Background

The following facts are recited in the light most favorable to Cannon, the nonmoving party.[13]  Cannon, an inmate at the Anamosa State Penitentiary, injured his right wrist playing basketball around 2:30 p.m. on Sunday, August 2, 2020.  Shortly after he fell, Cannon encountered Nurse Courtney Friedman (a Defendant) in front of his living unit.  He showed her his hand and explained what had happened.  Nurse Friedman did not evaluate Cannon's wrist but agreed that something "appeared wrong" and asked if he could wait until the following morning to go to sick call.

The Anamosa prison infirmary had sick call hours from 8:15 to 10:15 a.m., Monday through Friday.  Def. App. 11.  An inmate could send a kiosk message to schedule an appointment at the infirmary during sick call.  An inmate could also present to the infirmary outside of sick call hours, as it was staffed with medical personnel 24 hours a day, 7 days a week, but would be seen without an appointment only in cases of medical emergency.[14]

---

[13] Unless otherwise noted, the facts in this section are taken from Defendants' Statement of Facts (Def. SOF) admitted by Plaintiff in his response thereto (Pl. Resp. SOF) (Docs. 33, 39), as well as from Plaintiff's Statement of Facts (Pl. SOF), to which Defendants did not file a response (Doc. 39-3).  *See* **LR 56(d)** (the failure to reply to the nonmoving party's statement of facts "may constitute an admission of th[ose] fact[s]").

[14] Defendants argue an inmate did not need an appointment to present to sick call and could ask to be seen at the infirmary at any time, relying on the affidavit of the administrator of nursing for the Iowa Department of Corrections.  Def. App. 11.  Cannon submitted an affidavit, however, stating that due to the COVID-19 pandemic, "inmates were not to go to sick call [without] an appointment or a pass from a [correctional officer]."  Pl. App. 7.  Cannon also notes that his experience (described further below) demonstrates an inmate would not necessarily be seen outside of sick call hours.  Nurse Friedman's deposition testimony supports Cannon's understanding of Anamosa's infirmary policies, as she testified that an inmate needed to send a

6

Ultimately, Cannon went to the infirmary outside of sick call hours on August 2 after speaking to a correctional officer and another inmate about his wrist, which was very swollen. Cannon spoke with the front desk officer at the infirmary around 5:00 p.m. and requested to see a nurse due to wrist pain. After conferring with the nurses, the front desk officer told Cannon that the nurses would not see him unless it was an emergency. Cannon said it was an emergency and again requested to see a nurse. Nurse Barbara Devaney (a Defendant) came out and told Cannon that no one would see him and that he needed to leave. Cannon began telling her about his injury and requesting particular medical treatment. Nurse Devaney testified at her deposition that during this time, she observed Cannon moving his hand, wrist, and fingers; that she did not see any bruising or deformities; and that she could tell Cannon's palm was pink; therefore, she assessed his injury as nonemergent. This testimony differs slightly from Nurse Devaney's response to Cannon's Grievance over this incident, in which she indicated she "took a look at" Cannon's wrist and "determined it was not an emergency," as "his hand was pink, warm and dry." Def. App. 338. Nurse Friedman also came out and heard Cannon complain of wrist pain. *See id.* at 331-34. Nurse Devaney again told Cannon (while Nurse Friedman was present) that Cannon needed to leave. Neither nurse conducted any kind of physical examination of Cannon's wrist, nor documented Cannon's visit to the infirmary in any way, despite prison policy requiring "staff . . . document health services provided[ e]ach time a practitioner sees a patient regarding a health problem[] or is consulted regarding [a] patient's health status." Pl. SOF. A corrections officer told Cannon to ice his wrist and report to sick call in the morning, and Cannon made an improvised splint to use overnight. Cannon left without treatment; a decision the infirmary's front desk officer indicated she disagreed with.

---

kiosk message to schedule an appointment to be seen at the infirmary, unless it was a medical emergency. Pl. App. 101, 112.

Nurses cannot diagnose broken bones—that requires a doctor and an X-ray. But they can treat symptoms with ice, pain medications, instructions to elevate, and an immobilizer like an ACE bandage wrap or splint. Def. App. 436-37; Pl. App. 61-62, 96, 152-53. Nurse Friedman testified that if an inmate presented to the infirmary outside of sick call hours, a nurse should perform an assessment to determine whether the inmate needed emergency treatment. Pl. App. 101-03. She further testified that if an inmate presented with a suspected broken bone—or even just pain complaints that could signal a broken bone—the inmate should be assessed and seen. Pl. App. 99, 103, 113. She testified that prison policy required that the doctor be notified of suspected fractures and that the doctor would determine next steps (including whether to see the inmate immediately). Pl. App. 96-97, 109. Similarly, Nurse Devaney testified that if an inmate presented to the infirmary with a wrist injury outside of sick call hours, a nurse should conduct a "quick triage" to determine whether the inmate needed urgent care or whether the inmate could wait for sick call hours. Def. App. 432-35. She testified that if the inmate had a possible broken bone, the nurse should conduct a physical evaluation (even if outside of sick call hours) assessing capillary refill, motor function, numbness and tingling, color, swelling, and obvious deformities on palpation. Def. App. 436-37. She testified that if the doctor could not see the inmate immediately for a broken bone, a nurse would instruct the inmate to treat the injury with ice and elevation, and if the broken bone was "minor," provide an ACE wrap and instruct the inmate to return in a week when swelling and pain decreased. Pl. App. 436-37.

Early the next morning, around 6:30 a.m. on August 3, Cannon sent a kiosk message to sick call, stating, "I believe I broke my hand yester day and I would like to see the doctor today." Pl. App. 159. Cannon went to sick call and was seen by Nurse Amy Shipley (a Defendant) around 8:14 a.m. According to Cannon's affidavit, at that time, he could not move his wrist or hand, other than the tips of his fingers. Nurse Shipley's treatment note of the encounter reflects Cannon stated that he fell on his right hand playing basketball; that he could move his fingers; that he could move his thumb

"some," but it was swollen and "tight feeling"; that he had pain and swelling in the base of his thumb; that he could not bend his wrist; that he had shooting pain from his fingers, around his wrist, and up his arm; and that he thought he had "ripped some tendons." Def. App. 21-23. On examination, Nurse Shipley noted Cannon was "able to perform opposition, though is somewhat difficult to do with right thumb"; that his range of motion was limited; and tenderness on palpation. *Id.* Nurse Shipley gave Cannon an ACE bandage wrap and extra pillow, obtained an order for ten days of ibuprofen from Dr. Michael Dehner (a Defendant), and instructed Cannon to elevate his right hand as much as possible and use ice as needed. *Id.* Nurse Shipley's treatment note indicates that she "[s]cheduled off a recheck of hand/wrist"; however, it did not list a time for a follow-up appointment, and none was scheduled. *Id.* Nurse Shipley responded to Cannon's kiosk message from earlier in the day, noting that he had been seen at sick call. Pl. App. 159.

Nurse Shipley testified that diagnosis and treatment of a broken bone was up to the doctor, but a nurse could manage symptoms. Pl. App. 147-49, 154. She testified that if an inmate presented with an injury after a fall, a nurse should assess displacement, swelling, bruising, redness, range of motion, and pain. Pl. App. 148. She testified that emergent conditions, such as gross displacement, gross swelling, or open wounds, required referral to the doctor; otherwise, a nurse could form a treatment plan. Pl. App. 149. She testified that for small fractures without obvious displacement, she "usually always splint[s] someone or at least Ace wrap[s] them." *Id.* She noted it is possible to have a fractured wrist without obvious displacement, which would be discovered on re-check with a referral to a physician and order for X-rays. Pl. App. 149-150. She testified that she did not view Cannon's injury as emergent requiring an immediate X-ray but that he should have been scheduled for a re-check appointment to check swelling, pain, and range of motion, and referred to the doctor and for X-rays at that time if needed. Pl. App. 150, 152-56.

Also on the morning of August 3, Cannon sent a kiosk message to the infirmary's medical supervisor, asking to speak with her about "a nurse from yesterday." Pl. App.

9

159.  She asked him to stop by before 11:00 a.m.  *Id.*  Cannon responded that he had not been able to stop by due to his work in the kitchen, frying chicken, but said he would try to talk to her when he picked up his pills.  *Id.*  Later that day, Cannon successfully spoke with the medical supervisor, and she said she would talk with Nurse Devaney and Nurse Friedman because if an inmate asks to be seen for an emergency, he should be seen.

A few days later, on Friday, August 7, Cannon sent a kiosk message to sick call around 6:30 a.m.  Pl. App. 159.  He stated he "really need[ed] to see the Doctor."  *Id.*  A nurse responded the next day, asking why Cannon wanted to see the doctor.  *Id.*  Cannon said he wanted to see the doctor about his wrist, as "[t]here seems to appear as if something is torn or ripped" and "I have limited range of motion with my thumb and wrist."  *Id.*  The nurse responded that she would schedule an appointment with the doctor.  *Id.*

On Thursday, August 13, Cannon sent a kiosk message asking for the date of his doctor's appointment.  *Id.*  A nurse responded that he did not have an appointment scheduled, so she "added [him] for Monday" (August 17).  *Id.*  No appointment was scheduled.  On Tuesday, August 18, 2020, Cannon sent a kiosk message to sick call at 7:26 a.m., stating:

> It has been 16 days now since I've injured myself and I have not seen the doctor.  I'm now told that I will be added back to the list to see the doctor, I know that [the prison] does not have a X-RAY machine and that the X-ray Tec only comes in once a week.  So this means that I have to wait another 2 weeks.  I am in constant pain and think there is a broken bone in my wrist.

*Id.*  A nurse responded at 10:16 a.m. instructing Cannon to present to sick call the following morning "to be evaluated further and to see if X-ray is needed."  *Id.*

Cannon saw Nurse Amy Neuhaus at 8:35 a.m. during sick call on Wednesday, August 19, 2020.  Cannon stated that he was at sick call to see if he needed X-rays for his right wrist, as it still hurt from a basketball injury a few weeks ago and was not improving with the ACE bandage wrap.  On examination, Nurse Neuhaus noted limited

range of motion, tenderness on palpation, swelling, and an inability to flex or extend without pain. Nurse Neuhaus consulted with Dr. Dehner and obtained orders for a cock-up wrist splint, an X-ray, and continued over-the-counter pain medication. *See* Pl. App. 71-72.

Cannon did not receive a wrist X-ray until three days later, on Saturday, August 22, 2020. Def. App. 28. The prison has an X-ray machine onsite, but technicians able to operate the machine visit only once every two weeks; thus, Cannon's X-ray corresponded with the technicians' availability. Medical staff is able to refer an inmate to the University of Iowa Hospitals & Clinic (UIHC) or another hospital, however, to obtain an X-ray more immediately. Pl. 134-35, 156. It is up to Dr. Dehner to decide whether to refer an inmate outside of the prison for an X-ray. Pl. 135.

Dr. Dehner reviewed the X-ray on Monday, August 24, 2020, and determined that Cannon's right wrist was broken. Dr. Dehner's treatment notes reflect a nondisplaced fracture through the joint of his distal radius. In interrogatory responses, Dr. Dehner described Cannon's injury as a "minimally displaced distal radius fracture . . . managed conservatively with analgesics and splinting," shown by X-ray to have "the articular surface of the distal radius . . . involved." Def. SOF; Pl. Resp. SOF.

Dr. Dehner met with Cannon the day he reviewed the X-ray (August 24) around 11:18 a.m. Def. App. 33-34. Cannon reported a sore wrist (joint pain and paresthesia) since his basketball injury, helped with ibuprofen; that he had been wearing the wrist splint during the day, although it irritated his skin; and that his wrist hurt a great deal at night without the splint. *Id.* On objective examination, Dr. Dehner noted negative for muscle weakness, positive for full range of motion in the hand and wrist, and wrist pain with movement. *Id.* Dr. Dehner's treatment note indicates Cannon would be referred to UIHC as soon as possible "regarding need for cast." *Id.* The referral itself, however, leaves blank the "urgency of appointment" line. *Id.* at 36.

Dr. Dehner testified that a fracture involving a displaced bone needs to be set back into place with a cast to heal properly; but an ACE wrap is adequate for immobilization

if the fracture does not involve displacement or terrible swelling. Pl. App. 58-62. Dr. Dehner testified that the speed at which a displaced bone needs to be set to avoid deformity depends on the bone and that "[a]s soon as you know there's a fracture, if there's deformity, it should be addressed." Pl. App. 59. He acknowledged that a fracture would have already begun to heal after seventeen days; and that if displaced, it would have already begun to heal in a displaced position after five weeks. Pl. App. 70, 75. He testified that there is not "a point at which it is no longer useful to set a deformed fracture," because a displaced fracture that healed incorrectly could always be rebroken and reset. Pl. App. 59. He testified that he would not order an outside X-ray unless there was an "urgent need" due to "displacement, injury, deformity, bleeding, [or] loss of function." Pl. App. 71. He noted that if the fracture involved displacement, "[y]ou're going to want an X-ray sooner" and that an X-ray is the "easiest way" to diagnose displacement, "but you can tell clinically if there's deformity that something's displaced." Pl. App. 65-66.

Two weeks after his appointment with Dr. Dehner, Cannon still had not been taken to UIHC nor received any further treatment for his broken wrist. He filed a Grievance regarding his medical treatment on Monday, September 7, 2020 (the Grievance). He described Nurse Friedman refusing to assess his wrist outside the infirmary on August 2 and asking him to wait for sick call the following morning; Nurse Friedman and Nurse Devaney declining to evaluate him when he presented to the infirmary outside of sick call hours on August 2; being given only an ACE bandage, ice, and ibuprofen on August 3 without being seen by the doctor; multiple kiosk messages asking to see the doctor; and when he finally met with Dr. Dehner on August 24, being told that he needed to go to UIHC as soon as possible for a cast. Def. App. 331-34. He concluded that he still had "not been taken to the [UIHC] to have any medical performed on [his] wrist" and that he "ha[s] been in constant pain and ha[s] been taking ibuprofens only." Def. App. 334.

Three days later, on Thursday, September 10, 2020, Cannon saw orthopedic nurse practitioner Katharine Staniforth (NP Staniforth) at UIHC. S. Pl. App. 22-27. She

12

obtained a new X-ray and diagnosed Cannon's broken wrist as a "minimally displaced comminuted intra-articular right distal radius fracture." *See also* Pl. App. 25-26. NP Staniforth determined that it was too late to put a cast on Cannon's wrist, as it had already started to heal (in a slightly displaced position). She directed Cannon to continue to use his wrist brace with activity, "removing it for finger and wrist range of motion," and to follow up in three to four weeks. *Id.* at 25.

Over the next year, Cannon continued to follow-up with NP Staniforth for his right wrist, as well as see Dr. Dehner and nurses at the prison. The prison implemented all treatment recommended by UIHC. Treatment records reflect Cannon continued to complain of generalized stiffness, muscle weakness, and numbness in the ring and pinky fingers, and providers observed limited range of motion and tenderness on palpation. New X-rays in April 2021 showed "healed distal radius fracture with evidence of ulnar impaction" and "mild ulnar variance." Pl. SOF. Providers at UIHC ultimately diagnosed Cannon with ulnar impaction syndrome, meaning that the way his wrist had healed (with displacement) affected how the surrounding nerves, tendons, and muscles worked. As a result, Cannon underwent surgery in October 2021 (a right ulnar shortening osteotomy) in which his ulnar was broken to bring it back into alignment with his displaced radius. *See also* Def. App. 201-06.

Cannon obtained expert-opinion evidence that it is common practice to obtain X-rays after a wrist injury like Cannon's if pain does not improve within 24 to 72 hours. Cannon's expert also opined that Cannon would have benefitted from a cast and "if caught in the first 24 hours[,] possibly traction to help align the angulation of the [fracture]." Pl. SOF. Cannon's expert opined that the delay in diagnosis and treatment of Cannon's right wrist fracture ultimately led to ulnar compaction syndrome, which had to be corrected through surgery and which would have been avoided if his broken wrist had been treated promptly.

Cannon initiated this lawsuit in November 2021, bringing a claim under 42 U.S.C. § 1983 for deliberate indifference to a serious medical need in violation of the Eighth

Amendment. Doc. 1. Cannon named Dr. Dehner, Nurse Shipley, Nurse Friedman, and Nurse Devaney as Defendants, as well as four other prison employees: Kristoffer Karberg, Sally Potter, Amy Neuhaus, and Laura Barner. *Id.* Defendants filed a motion for summary judgment as to all Defendants. Doc. 27. Cannon partially resisted, agreeing that his claims against Defendants Karberg, Potter, Neuhaus, and Barner should be dismissed. Doc. 44. Defendants filed a reply. Doc. 49.

### B. Discussion

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant [a motion for] summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." For the plaintiff to avoid summary judgment, sufficient evidence must exist "on which the jury could reasonably find for the plaintiff."[15] The court "view[s] the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor."[16]

Defendants argue that Cannon's claims against Dr. Dehner and Nurse Shipley must be dismissed for failure to exhaust administrative remedies. Next, Defendants argue Cannon cannot prove that he suffered a physical injury, as his broken wrist healed despite the delay in treatment, and his ulnar impaction syndrome was caused by the repetitive use of his wrist at work, rather than by the way the fracture healed. Defendants also argue there is no evidence Nurse Friedman was involved in Cannon's treatment and therefore the claim against her must be dismissed. Finally, Defendants argue that there

---

[15] ***Olmsted v. Saint Paul Pub. Sch.***, 830 F.3d 824, 828 (8th Cir. 2016) (quoting ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 252 (1986)).

[16] ***Soo Line R.R. Co. v. Werner Enters.***, 825 F.3d 413, 418 (8th Cir. 2016) (quoting ***Bishop v. Glazier***, 723 F.3d 957, 960-61 (8th Cir. 2013)).

14

is insufficient evidence of deliberate indifference, as there is no evidence Cannon's treatment was inappropriate or untimely, and that they are entitled to qualified immunity.

### 1. Failure to Exhaust

Under the Prison Litigation Reform Act of 1995 (PLRA), an inmate is required to exhaust administrative remedies before bringing a federal lawsuit challenging conditions of confinement.[17]  The parties agree that Cannon exhausted his administrative remedies with respect to the Grievance.  They disagree whether the Grievance covers Cannon's deliberate-indifference claims against Dr. Dehner and Nurse Shipley.

Defendants argue that in the Grievance, Cannon complained only about the treatment received from Nurse Friedman and Nurse Devaney on August 2.  Defendants acknowledge that the Grievance outlines the care Cannon received for his wrist to date (through September 7, 2020), but they argue that the Grievance did not complain about this care and suggested it was proper.

I disagree.  With regard to Nurse Shipley's treatment on August 3, the Grievance states:  "On 8-3-2020 I went to sick call at 8:30 A.M. and was given a ace wrap, and ice for the swelling; I was also given ibuprofen for the pain and told that when the swelling went down I would see the doctor if needed."  Def. App. 333.  The Grievance goes on to describe Cannon's efforts to see the doctor, noting that Cannon "look[ed] for an appointment with the doctor" every day until August 12, to no avail; that Cannon sent a kiosk message on August 12 about a doctor's appointment and was told he would see the doctor on August 17; that August 17 came and went without a doctor's appointment; and that Cannon finally saw the doctor on August 24 (after being treated by a nurse on August 19 and having X-rays taken on August 22).  *Id.*  Cannon concludes:

> I was seen by the doctor here at the institution, and I was told that my wrist was indeed fractured and that he needed to get me to [UIHC] to have a cast

---

[17] **42 U.S.C. § 1997e(a)**.

put on my wrist A.S.A.P., that I am to keep the brace on to help keep my wrist [straight] as I can. . . . It's now 9-7-20 and I have not been taken to the [UIHC] to have any medical performed on my wrist. I have been in constant pain and have been taking ibuprofens only.

*Id.* at 333-34.

Cannon's Grievance contains factual allegations related to the treatment provided by Nurse Shipley and Dr. Dehner.[18] Overall, Cannon's Grievance complains about the delay in seeing a doctor and in being taken to UIHC for a cast. The Grievance can be read to attribute this delay to Nurse Shipley in part due to her failure to refer Cannon to a doctor on August 3, as well as her lack of treatment on that date beyond ice, ibuprofen, and an ACE bandage wrap. The Grievance also suggests Dr. Dehner is to blame for the delay in Cannon receiving a cast and treatment from UIHC, since Dr. Dehner suggested UIHC evaluate Cannon as soon as possible, but Cannon still had not received this treatment two weeks later.

"It is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."[19] Thus, "[t]he level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim."[20]

Here, Anamosa's grievance policy does not impose substantive requirements on the level of detail required in grievances. *See* Def. App. 448-55. In addition, the preprinted grievance form requests only that the prisoner generally provide a "description

---

[18] *Cf. **Townsend v. Murphy***, 898 F.3d 780, 784 (8th Cir. 2018) (holding prisoner failed to exhaust administrative remedies as to two defendants when grievance did not name the defendants nor describe any of the specific factual allegations involving those defendants); ***Burns v. Eaton***, 752 F.3d 1136, 1141-42 (8th Cir. 2014) (holding prisoner failed to exhaust administrative remedies as to one defendant when grievance did not name defendant nor include any allegations related to that defendant; and even though prison obtained statement from defendant as part of investigation in resolving grievance, the prison did not evaluate the defendant's conduct in resolving the grievance).

[19] ***Burns***, 752 F.3d at 1141 (cleaned up) (quoting ***Jones v. Bock***, 549 U.S. 199, 218 (2007)).

[20] ***Jones***, 549 U.S. at 218.

of problem."[21]  Def. App. 456-57.  Ultimately, viewing the facts in the light most favorable to Cannon, his Grievance satisfied the purpose of the exhaustion requirement, which is to give the prison "time and opportunity to address complaints internally," allowing the prison to take "corrective action" if necessary and "obviating the need for litigation"; to "filter out some frivolous claims"; and to facilitate court review with "an administrative record that clarifies the contours of the controversy."[22]

The prison's response to Cannon's Grievance further supports that the Grievance raised Cannon's claims against Nurse Shipley and Dr. Dehner.  The prison's response notes that Cannon was seen on August 3 "and a treatment plan was put into place," which Dr. Dehner "stated . . . was appropriate at that time."  Def. App. 338-39.  The prison's response also notes that after Cannon met with Dr. Dehner on August 24, Dr. Dehner referred Cannon to UIHC and "was comfortable with Cannon wearing the brace on his wrist until that time."  *Id.* at 339.  The response indicates that Cannon went to UIHC on September 10 and October 5 and that "they recommended he continue to wear the brace." *Id.*  A factfinder could conclude that the prison's response addresses whether the care provided to Cannon by Nurse Shipley on August 3 and by Dr. Dehner on August 24 was proper.[23]

In his appeal of the Grievance, Cannon stated Nurse Shipley treated him on August 3, 2020, and "told [him] that [he] would be re-evaluated in a few days," but "no one has

---

[21] *Cf. Townsend*, 898 F.3d at 784 (in considering prison's specific administrative requirements, noting preprinted grievance form instructed prisoner to "be specific as to the complaint, date, place, and name of personnel involved" (cleaned up)).

[22] *Johnson v. Jones*, 340 F.3d 624, 626-27 (8th Cir. 2003) (quoting *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002)).

[23] *See Burns*, 752 F.3d at 1141 (considering whether prison evaluated the merits of inmate's claim in determining whether inmate exhausted administrative remedies); *cf. Hammett v. Cofield*, 681 F.3d 945, 947 (8th Cir. 2012) ("[A] grievance that could have been denied for failure to comply with a procedural requirement is nonetheless exhausted for PLRA purposes if the institutional decision-maker instead denied it on the merits.").

taken the time to speak with her to even see where I supposed [sic] to come back over to the infirmary or not." Def. App. 341. Cannon also said that when Dr. Dehner saw him on August 24, he said "he would get [Cannon] to the UIHC [o]rtho before the week was out." *Id.* at 342. Cannon wrote:

> The reason the [UIHC] doctor . . . continued the wrist brace was because the doctor and [nurses] here waited too late to send me . . . to UIHC to have a cast placed on. [The UIHC doctor] said I should have been fitted for a cast the first week I got injured and not five weeks later. The doctor told me that a cast is to be placed on for 6 weeks and it is already 5 weeks and she couldn't put one on because she would be removing it the next week.

*Id.* Cannon concluded that he tried to seek medical attention and was denied care, and as a result, he "had to wait almost 5 weeks before even an attempt was made to fit [him] for a cast," and by that time, it was too late. *Id.* at 342-43.

The prison denied Cannon's appeal, "find[ing] that care was provided consistent with the expectations of our current policies/procedures." Def. App. 344. Cannon appealed again, asking that videotapes of the infirmary from August 2 be reviewed. Def. App. 346. He explained that if his wrist had been examined at that time, the nurses would have set an appointment for him to see the doctor the next day, since it was clear something was seriously wrong with his wrist. *Id.* at 346-47. He noted that the nurse who provided care on August 19 and the UIHC doctor both determined his wrist was broken, the former before X-rays were taken. *Id.* at 347. Cannon concluded that the prison's response to his appeal was untimely and that it should be thrown out, as "procedures [were] not followed[, just] as it was not followed when [he] went to seek medical attention from the infirmary for [his] wrist." *Id.* He again asked that video from August 2 be reviewed. *Id.*

In the final denial, the prison stated:

> [Y]ou were seen several times in August 2020 and a referral was made to an Orthopedic specialist for 9-10-20. At said time you were placed on a plan with follow up and evaluations and currently there does not appear to be any current indications for additional evaluations and[/]or therapy,

18

further you will continue to be followed by an Ortho specialist as recommended. . . . I am denying your appeal as there is no indication that further action needs to be taken considering the health care providers have attended to your medical needs and continue to provide care.

*Id.* at 349. As with the prison's prior response, this response suggests that the prison viewed Cannon's Grievance as complaining about the delay in treatment for his wrist as a whole, not just the treatment he received on August 2. A factfinder could conclude that Cannon adequately exhausted his administrative remedies.[24]

Nurse Shipley and Dr. Dehner are not entitled to summary judgment based on their exhaustion affirmative defense.

### 2. *Physical Injury*

Defendants argue that Cannon cannot prove he suffered a physical injury, as required to recover monetary damages under the PLRA.[25] They argue that the basketball game, not Defendants' actions, caused Cannon's broken wrist, which has since resolved. And they argue that Cannon's work, rather than the delay in treatment, caused the ulnar problem ultimately resulting in surgery.

---

[24] *See Smith v. Liggett*, No. 6:19-CV-06003, 2020 WL 5809969, at *6, *8-9 (W.D. Ark. July 2, 2020) (when grievance complained that inmate had not received X-ray results more than a month later, had constant knee pain, and was not getting the treatment warranted, rejecting prison's argument that "main issue" in grievance was delay in receiving X-rays, rather than inmate's general concern he was not receiving medical treatment for knee; and rejecting similar argument that later grievance did not raise claim related to prison doctor's delay in treatment when the grievance stated that a specialist had determined the inmate's knee was already in the process of healing itself since he did not get treatment within two to three weeks of the injury, that the prison doctor's negligence in getting the inmate to the specialist in a timely manner would require re-breaking the leg to fix it properly, and that the specialist recommended the inmate apply pressure to his broken leg, which was advice that differed from another specialist and that the prison doctor was following), *report and recommendation adopted,* 2020 WL 5803471 (Sept. 29, 2020).

[25] **42 U.S.C. § 1997e(e)** (providing that an inmate may not bring an action "for mental or emotional injury suffered while in custody without a prior showing of physical injury").

19

As Cannon notes, however, the Eighth Circuit has interpreted the PLRA as requiring "a showing of harm caused by some unconstitutional conduct that amounted to deliberate indifference *and* an accompanying showing of physical injury," but the unconstitutional conduct need not be the cause of the physical injury.[26] For example, when a correctional officer delays an inmate's treatment for a heart attack, resulting in pain and suffering that could have been avoided with timely care, the heart attack satisfies the physical-injury requirement.[27] Similarly, here, Cannon's broken wrist constitutes a physical injury for purposes of the PLRA.

In any event, Cannon offers evidence that the delay in treatment caused physical injury beyond pain and suffering. A prisoner alleging a delay in medical treatment must offer medical evidence of "the detrimental effect of [the] delay in medical treatment."[28] The treatment records from both Dr. Dehner and UIHC reflect that as his fractured wrist healed, Cannon continued to complain of numbness and weakness in the ring and little fingers or paresthesia in the ulnar digits. Def. App. 50, 75, 105, 128, 146, 151, 158; Pl. Sealed App. 73-75. UIHC treatment records provide support that Cannon's ulnar symptoms were the result of the way his fractured wrist healed: NP Staniforth noted in April 2021 that an X-ray of Cannon's right wrist "demonstrate[d] healed distal radius fracture with evidence of ulnar impaction"; a June 2021 treatment note from the UIHC surgeon reflects the doctor "reviewed with [Cannon] the cause of the underlying ulnar impaction" and "discussed this in relation to the distal radius fracture he had"; and an October 2021 treatment note from the UIHC surgeon reflects Cannon underwent surgery "after experiencing chronic symptoms following distal radius fracture in August 2020 which had been managed conservatively." Def. App. 149, 216; S. Pl. App. 78. In

---

[26] *McAdoo v. Martin*, 899 F.3d 521, 526 (8th Cir. 2018).

[27] *See id.* (citing *Sealock v. Colorado*, 218 F.3d 1205, 1207-10 & n.6 (10th Cir. 2000)).

[28] *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005) (quoting *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997)).

addition, Cannon offered expert-opinion evidence that the "delay in diagnosis and treatment of his right radius fracture . . . ultimately [led] to secondary consequences including new right wrist pain as a result of ulnar compaction syndrome[,] which required surgery to improve and could have been avoidable if the radius fracture had been treated promptly and correctly initially." Pl. SOF.

Here, viewing the facts in the light most favorable to Cannon, the delay in treatment of his broken wrist resulted in it healing in a way that Cannon continued to suffer ulnar impaction, which ultimately required surgery to fix. To the extent Defendants argue other causes are to blame for Cannon's ulnar impaction syndrome, these are genuine disputes of material fact to be resolved by the jury.

### 3. Nurse Friedman

Defendants argue that Cannon's deliberate-indifference claim against Nurse Friedman must be dismissed, as she "had no involvement in the medical care provided to Cannon for his right wrist injury from August 2, 2020[,] through September 10, 2020." Doc. 27-1 at 13. Defendants point to Nurse Friedman's testimony that she never treated Cannon's wrist and that she did not recall speaking to Cannon about his wrist on August 2 (either in or out of the infirmary). Def. App. 337; Pl. App. 104, 107-08. But Defendants also acknowledge that the facts must be viewed in the light most favorable to Cannon. According to Cannon's affidavit, he ran into Nurse Friedman shortly after he fell on August 2, showed her his hand, and explained what happened; and Nurse Friedman acknowledged something appeared to be wrong with Cannon's wrist but asked if he could wait until the following day to go to sick call. Pl. App. 2-3. Cannon also averred that Nurse Friedman was present when he sought care from the infirmary the day he injured his wrist and the nurses refused to see him, as they did not think his wrist injury was an emergency. Pl. App. 3-4; *see also* Def. App. 331-33 (Cannon's Grievance

21

raised similar complaints).  His affidavit also states Nurse Friedman did not conduct any kind of physical examination on his wrist.  Pl. App. 4.

Defendants argue that there is no evidence Nurse Friedman was involved in "the medical decisions made concerning the assessment and treatment of Cannon's right hand basketball injury."  Doc. 27-1 at 13.  I disagree.  A jury could find that Nurse Friedman refused to examine Cannon's broken wrist when he presented to the infirmary on August 2 and failed to provide any treatment.

### 4.  Deliberate Indifference

Defendants argue that Cannon cannot prove that they acted with deliberate indifference to a serious medical need.  They argue that they timely and appropriately treated Cannon's wrist injury and that Cannon's claim amounts to a difference in opinion over the proper course of treatment—which does not establish deliberate indifference.

Cannon's § 1983 deliberate-indifference claim requires proof "(1) he had 'an objectively serious medical need,' and (2) [Defendants] 'knew of and disregarded that need.'"[29]  Thus, a deliberate-indifference claim "has both an objective and a subjective component."[30]

"An objectively serious medical need is one that has been 'diagnosed by a physician as requiring treatment' or one 'so obvious even a layperson would easily recognize the necessity for a doctor's attention.'"[31]  As Cannon notes, Defendants do not

---

[29] *De Rossitte v. Correct Care Sols., LLC.*, 22 F.4th 796, 802 (8th Cir. 2022) (quoting *Redmond v. Kosinski*, 999 F.3d 1116, 1119 (8th Cir. 2021)).

[30] *Corwin v. City of Indep., MO.*, 829 F.3d 695, 698 (8th Cir. 2016)

[31] *De Rossitte*, 22 F.4th at 802 (quoting *Barton v. Taber*, 908 F.3d 1119, 1124 (8th Cir. 2018)).

22

dispute that a broken wrist constitutes an objectively serious medical need.[32]  Instead, they focus their argument on the subjective element.[33]

The subjective element requires proof Defendants "actually knew of the medical need but were deliberately indifferent to it."[34]  This standard requires something more than mere negligence or medical malpractice,[35] but less than acting (or failing to act) with "the very purpose of causing harm or with knowledge that harm will result."[36]  Defendants must have acted with a state of mind akin to criminal recklessness—that is, with reckless disregard to a serious medical need of which the person is aware.[37]  In other words, Defendants "'must both be aware of facts from which the inference could be

---

[32] *See also* **Corwin**, 829 F.3d at 698 (parties did not dispute "that [plaintiff's] fractured hand was an objectively serious medical need"); **Bryan v. Endell**, 141 F.3d 1290, 1291 (8th Cir. 1998) (per curiam) ("There is no doubt that the plaintiff had a serious medical need. His hand had been broken."); **Robinson v. Moreland**, 655 F.2d 887, 890 (8th Cir. 1981) ("A broken hand can be considered by the jury to be a serious injury.").

"[A] prison official violates the Eighth Amendment by being deliberately indifferent *either* to a prisoner's *existing* serious medical needs *or* to conditions posing a substantial risk of serious *future* harm."  **Shipp v. Murphy**, 9 F.4th 694, 703 (8th Cir. 2021) (quoting **Aswegan v. Henry**, 49 F.3d 461, 464 (8th Cir. 1995)).  Here, Cannon's broken wrist constituted an existing serious medical need.

[33] To the extent Defendants argue "'the objective seriousness'" of a delay in medical treatment must be "'measured by reference to the effect of delay in treatment'" and requires "verifying medical evidence . . . to establish the detrimental effect of the delay," **Coleman v. Rahija**, 114 F.3d 778, 785 (8th Cir. 1997) (quoting **Crowley**, 109 F.3d at 502), Cannon has provided such evidence (discussed in the section on physical injury).

[34] **Jones v. Minn. Dep't of Corr.**, 512 F.3d 478, 481 (8th Cir. 2008).

[35] **Estelle v. Gamble**, 429 U.S. 97, 106 (1976).

[36] **Farmer v. Brennan**, 511 U.S. 825, 835 (1994).

[37] **Id.** at 836-37, 839-40 (holding that "acting or failing to act with deliberate indifference to a substantial risk of serious harm . . . is the equivalent of recklessly disregarding that risk"; adopting criminal-law recklessness standard, which "generally permits a finding of recklessness only when a person disregards a risk of harm of which he is aware"; and describing decision as requiring "consciousness of a risk").

drawn that a [serious medical need] exists, and [they] must also draw the inference' before acting—or failing to act—with a conscious disregard for the [medical need]."[38]

A plaintiff may prove knowledge of a serious medical need through "inference from circumstantial evidence."[39] For example, "a factfinder may conclude that a prison official knew of a [serious medical need] from the very fact that the [medical need] was obvious."[40] But "[t]hat a trier of fact *may* infer knowledge from the obvious . . . does not mean that it *must* do so."[41]

"Similarly, an obviously inadequate response [to a serious medical need] may create 'an inference that the officer recognized the inappropriateness of his conduct'" and thus establish deliberate indifference.[42] For example, "[p]risoners may prove deliberate indifference by showing that the total deprivation of medical care resulted in 'pain and suffering.'"[43] Deliberate indifference may also be proven by evidence of "[g]rossly incompetent or inadequate care . . . so inappropriate as to evidence intentional

---

[38] *Blair v. Bowersox*, 929 F.3d 981, 987-88 (8th Cir. 2019) (quoting *Farmer*, 511 U.S. at 837); *see also Shipp*, 9 F.4th at 703 ("The evidence must show that the officers recognized that a [serious medical need] existed *and* knew that their conduct was inappropriate in light of that [need]." (cleaned up) (quoting *Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015))); *Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016) ("The plaintiff must prove . . . 'that Defendants actually knew of but deliberately disregarded his serious medical need.'" (cleaned up) (quoting *Scott v. Benson*, 742 F.3d 335, 340 (8th Cir. 2014))); *Bryan*, 141 F.3d at 1291 ("There must be actual knowledge of the [serious medical need], followed by deliberate inaction amounting to callousness.").

[39] *Farmer*, 511 U.S. at 842; *accord Barton*, 820 F.3d at 965.

[40] *Farmer*, 511 U.S. at 842.

[41] *Id.* at 844 (emphasis added).

[42] *Ryan v. Armstrong*, 850 F.3d 419, 425-26 (8th Cir. 2017) (quoting *Thompson v. King*, 730 F.3d 742, 747 (8th Cir. 2013)); *accord Barton*, 820 F.3d at 965.

[43] *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) (quoting *Estelle*, 429 U.S. at 103).

24

maltreatment or a refusal to provide essential care,"[44] or by evidence of "a doctor's decision to take an easier and less efficacious course of treatment."[45] On the other hand, medical providers do not act with deliberate indifference "if they responded reasonably to the [serious medical need], even if the harm ultimately was not averted."[46] Thus, a "showing that another physician might have ordered different tests and treatment does not show deliberate indifference."[47] Neither does "a disagreement as to the proper course of treatment."[48] "Deliberate indifference must be measured by the official's knowledge at the time in question, not by 'hindsight's perfect vision.'"[49]

### i.    Nurse Friedman and Nurse Devaney

Considering the facts in the light most favorable to Cannon, Nurse Friedman and Nurse Devaney both refused to treat Cannon's wrist when he presented to the infirmary with swelling, pain, and complaints suggesting his wrist might be broken (or at the very least, sprained). Earlier in the day, Cannon had shown Nurse Friedman his wrist, and she had agreed something appeared wrong. But when Cannon presented to the infirmary,

---

[44] **Dulany v. Carnahan**, 132 F.3d 1234, 1240-41 (8th Cir. 1997); *accord* **Redmond**, 999 F.3d at 1120 ("[M]edical treatment may so deviate from the applicable standard of care as to evidence a physician's deliberate indifference. Often whether such a significant departure from professional standards occurred is a factual question requiring expert opinion to resolve." (citations omitted) (quoting **Moore v. Duffy**, 255 F.3d 543, 545 (8th Cir. 2001))).

[45] **Langford**, 614 F.3d at 460 (quoting **Smith**, 919 F.2d at 93).

[46] **Farmer**, 511 U.S. at 844.

[47] **Dulany**, 132 F.3d at 1242.

[48] **Vaughan**, 49 F.3d at 1346; *see also* **Johnson v. Leonard**, 929 F.3d 569, 578 (8th Cir. 2019) (collecting cases).

[49] **Schaub v. VonWald**, 638 F.3d 905, 915 (8th Cir. 2011) (quoting **Lenz v. Wade**, 490 F.3d 991, 993 n.1 (8th Cir. 2007)).

Nurse Friedman and Nurse Devaney refused to treat him without conducting any kind of evaluation—they told him to leave, sight unseen.[50]

The front desk officer (nonmedical personnel) indicated she disagreed with Nurse Friedman's and Nurse Devaney's refusal to treat Cannon, and the medical supervisor indicated that if an inmate requests to be seen for an emergency, he should be seen. Both Nurse Friedman and Nurse Devaney knew that they should assess an inmate who presented to the infirmary complaining of an emergency or of pain complaints signaling a potential broken bone. They also knew that an inmate with a potential broken bone should be seen, even if outside of sick call hours, and at the very least, treated with an ACE bandage wrap and instructions to ice and elevate the injury. They also knew that the doctor should be informed and consulted regarding such injuries.

These facts are sufficient for a jury to infer that Nurse Friedman and Nurse Devaney knew Cannon's wrist injury was a serious medical need, yet acted with deliberate indifference to that need. A jury could find the nurses' refusal to treat Cannon without speaking to him or evaluating his injury amounts to more than a disagreement on proper treatment, and instead, constitutes "a refusal to provide essential care" or "[m]edical care so inappropriate as to evidence intentional maltreatment."[51] Cannon's

---

[50] A jury could discredit Nurse Devaney's testimony that she evaluated Cannon's wrist while speaking to him and concluded it was nonemergent, since according to Cannon, she had already told him to leave twice by that point (through the front desk officer and when she first emerged from the back). The jury could also consider that in responding to Cannon's Grievance, she indicated she looked at his wrist and it was warm, but she now admits she performed no evaluation other than what she could observe while Cannon was speaking to her.

[51] *Dulany*, 132 F.3d at 1241-42; *see Robinson*, 655 F.2d at 889-90 (holding that sufficient evidence existed to find guard deliberately indifferent to inmate's hand injured late on a Friday night when it appeared swollen and the inmate indicated he thought it was broken; and the guard did not refer the inmate to a nurse over the weekend as required by jail policy and instead simply provided ice until Monday morning); ***Warren v. Fanning***, 950 F.2d 1370, 1373 (8th Cir. 1991) (holding evidence was sufficient to support deliberate-indifference finding when prison doctor delayed six months in referring inmate to specialist based in part on fact that although inmate visited prison doctor frequently complaining of pain, at nine of those visits, doctor's primary treatment was nothing more than "patient reassurance"); *cf.* ***Johnson***, 929 F.3d at 576 (noting many cases in which court had found delayed dental treatment amounted to deliberate

characterization of the way Nurse Devaney spoke to him "reveals an attitude towards [his] medical needs that reasonably could be viewed as indifferent, if not contemptuous."[52] And there is evidence that Nurse Devaney and Nurse Friedman did not follow the prison's standard protocol.[53]

Reasonable minds could differ on whether Nurse Devaney's and Nurse Friedman's complete refusal to examine or treat Cannon's wrist injury supports an inference of deliberate indifference. Accordingly, Nurse Devaney and Nurse Friedman are not entitled to summary judgment on Cannon's deliberate-indifference claim.

### ii. Nurse Shipley

The morning after Cannon sustained his wrist injury, Nurse Shipley treated Cannon at sick call after he sent a kiosk message indicating that he thought he broke his hand and requesting to see the doctor. Viewing the facts in the light most favorable to

---

indifference "involve[d] almost a complete lack of treatment leading to . . . [a] worsening condition"); *Jackson v. Buckman*, 756 F.3d 1060, 1066-67 (8th Cir. 2014) (distinguishing complaint that doctor's "examination of his abdomen should have been more extensive in light of [plaintiff's] concern about the surgical wound," which did not amount to deliberate indifference, from complaint that doctor "completely refused to examine his abdomen").

[52] *Letterman*, 789 F.3d at 864 (holding jury could infer defendant acted with deliberate indifference in refusing to allow medical personnel to check on nonresponsive inmate based in part on defendant's statement to "let sleeping dogs lie"); *Warren*, 950 F.2d at 1373 (in determining deliberate indifference, considering defendant's attitude toward plaintiff reflected in trial testimony and statement that inmate was "a chronic complainer . . . whose complaints didn't pan out").

[53] *Letterman*, 789 F.3d at 863 (when defendant refused to allow medical personnel to check on inmate who had not moved in multiple hours, holding jury could infer deliberate indifference based on obviousness of the risk and based on defendant's knowledge of prison policies that medical personnel would only make such a request for potential emergencies and that a higher-up should be notified if an inmate was nonresponsive); *Croft v. Hampton*, 286 F. App'x 955, 956 (8th Cir. 2008) (per curiam) (relying in part on evidence that "nurses' acts conflicted with the emergency nursing protocol for fractures" in determining sufficient evidence existed to create a jury question on deliberate indifference); *cf. Hartsfield v. Colburn*, 491 F.3d 394, 397 (8th Cir. 2007) (holding that nurse did not act with deliberate indifference based in part on evidence that nurse's actions were consistent with procedures in jail manual).

Cannon, at that time, Cannon could not move his wrist at all, and he had limited range of motion of his fingers and thumb; the base of his thumb was swollen; his hand and wrist were tender on palpation; and he suffered shooting pain in the base of his thumb and wrist going up his arm. Nurse Shipley provided Cannon with an ACE bandage wrap and ibuprofen and instructed Cannon to use ice and elevation. She did not consult with Dr. Dehner about Cannon's treatment or the need for an X-ray, nor did she schedule a follow-up appointment.

There is evidence that prison policy required Dr. Dehner to be notified of suspected fractures so that he could direct treatment and determine whether to order X-rays. There is also evidence that it is common medical practice to order X-rays if pain and swelling remain after seventy-two hours. And Nurse Shipley acknowledged that even more minor wrist injuries treated with only an ACE bandage, elevation, ice, and ibuprofen should be re-checked in a week's time and referred to the doctor for evaluation and X-rays if symptoms such as swelling, pain, and limited range of motion remain.

Here, a jury could infer that Nurse Shipley knew Cannon's wrist injury constituted a serious medical need and should be treated as a suspected fracture based on her evaluation of Cannon's wrist, her knowledge that Cannon believed his wrist was broken, and her knowledge that at the very least, Cannon's symptoms needed to be re-checked in a week. A jury could also infer that Nurse Shipley acted with deliberate indifference in treating Cannon's wrist injury. Although Nurse Shipley provided Cannon with some care, she did not follow prison policy and notify Dr. Dehner of the potential fracture.[54] She also failed to schedule a follow-up appointment for Cannon, despite knowing that such an appointment was necessary to properly treat Cannon's wrist. That Nurse Shipley's failure went beyond mere negligence and amounted to deliberate inaction can be inferred based on the prison medical staff's "repeated pattern of neglect" in scheduling

---

[54] *See* note 53, *supra*.

28

Case 1:21-cv-00118-KEM   Document 59   Filed 04/14/23   Page 28 of 33

a follow-up appointment for Cannon—Cannon requested a follow-up appointment on Friday, August 7, and was told one would be scheduled (it was not); he requested a follow-up appointment on Thursday, August 13, and was told one would be scheduled for the following Monday (it was not); and he requested a follow-up appointment on Tuesday, August 18, which finally resulted in his wrist being re-checked more than two weeks after Nurse Shipley's initial examination.[55]

Viewing the facts in the light most favorable to Cannon, a jury could find that Nurse Shipley knew Cannon's wrist injury was a serious medical need and that she was deliberately indifferent to that need. Accordingly, summary judgment is not appropriate on Cannon's deliberate-indifference claim against Nurse Shipley.

---

[55] *De Rossitte*, 22 F.4th at 803-04 (holding that "[defendants'] alleged repeated pattern of neglect" and "repeated delays in providing batteries" for inmate's hearing aids "could justify an inference of deliberate indifference"); *see also Nelson v. Shuffman*, 603 F.3d 439, 444-45, 448-49 (8th Cir. 2010) (holding that jury could find defendant acted with deliberate indifference in delaying treatment when defendant recommended sexual-assault victim undergo eight psychotherapy sessions but failed to provide these sessions until more than fifty days after the sexual assault and "then only after [plaintiff] submitted multiple requests for treatment and threatened legal action"); *Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995) (when doctor determined defendant should see oral surgeon, holding that genuine issue of material fact existed whether doctor acted with deliberate indifference based on doctor's three-week delay in completing referral form "coupled with knowledge of the inmate-patient's suffering"). This repeated pattern of failing to schedule a follow-up appointment for Cannon distinguishes *Johnson v. Hamilton*, 452 F.3d 967, 971, 973 (8th Cir. 2006), in which the nurse determined the inmate's finger was likely fractured and required a referral to the doctor, but failed to schedule a doctor's appointment until the defendant submitted a medical request a month later, which resulted in the appointment being scheduled that day; the court held the delay amounted to negligence at most. Similarly, in *Fourte v. Faulkner County, Arkansas*, 746 F.3d 384, 386-87, 389-90 (8th Cir. 2014), the court held medical staff's failure to prescribe blood pressure medications after several high readings did not amount to deliberate indifference when medical staff acted in accordance with jail policy; and the court held that an eleven-day delay in receiving medications once prescribed did not amount to deliberate indifference, because as soon as the plaintiff complained about not receiving the medications, the doctor wrote a new prescription, and the plaintiff received the medications a day or two later.

29

### iii.    Dr. Dehner

No evidence establishes that Dr. Dehner was involved in Cannon's care or made aware of the seriousness of his wrist injury prior to Cannon's follow-up appointment with Nurse Neuhaus on August 19. Cannon suggests that because Nurse Shipley obtained an order for ibuprofen from Dr. Dehner on August 3, Dr. Dehner knew of Cannon's serious medical need at that time. But all the evidence supports that Nurse Shipley failed to alert Dr. Dehner to a possible fracture and need for an X-ray. Nor is there any evidence Dr. Dehner reviewed the treatment record from Nurse Shipley's August 3 examination or otherwise learned details of the encounter.

Nurse Neuhaus consulted with Dr. Dehner after treating Cannon on August 19 and observing limited range of motion, swelling, and tenderness that persisted seventeen days after the original injury. She obtained orders from Dr. Dehner for a cock-up wrist splint and X-ray. Dr. Dehner declined to send Cannon for an immediate X-ray outside the prison; instead, Cannon received a wrist X-ray when available at the prison three days later, on Saturday, August 22. Two days later, on Monday, August 24, Dr. Dehner reviewed the X-ray results, which showed Cannon's wrist was fractured and the bones minimally displaced. He evaluated Cannon's wrist for the first time and determined Cannon should be referred to UIHC for a cast as soon as possible. Cannon was not taken to UIHC until September 10, three days after he submitted a Grievance about the matter, more than two weeks after his appointment with Dr. Dehner, more than three weeks after his appointment with Nurse Neuhaus, and more than five weeks after his initial injury. By that point, his fracture had already started to heal with the bones displaced and it was too late for a cast.

A jury could find that Dr. Dehner knew of Cannon's serious medical need as early as August 19, after Nurse Neuhaus consulted with him. That Cannon's wrist had not healed more than two weeks after the initial injury and was still swollen and painful with limited range of motion suggests that it was likely broken, although an X-ray was required to definitively diagnose a fracture. Dr. Dehner's actions in ordering an X-ray and splint

30

on August 19 also support that he believed Cannon's wrist may have been broken at that time.  Moreover, by August 24, Dr. Dehner had reviewed the X-ray showing a displaced bone and confirmed Cannon's wrist was fractured.

Dr. Dehner knew that the sooner a fracture is treated with a cast, the better.  He knew that a fracture involving a displaced bone needs a cast to heal properly.  And he knew that a displaced bone would have already begun healing incorrectly five weeks after the initial injury, which could cause early onset arthritis.  Indeed, after reviewing the X-ray on August 24, he determined Cannon needed a cast as soon as possible.  Nevertheless, Cannon was not sent to UIHC until September 10.  Dr. Dehner's referral does not state the urgency of the appointment.  Dr. Dehner testified that September 10 was not late for Cannon to be evaluated because the healed bone could always be rebroken and reset.

A jury could infer deliberate indifference based on Dr. Dehner's delay in obtaining a cast to treat Cannon's broken wrist.  That Dr. Dehner testified to no urgency in obtaining a cast because the bone could always be rebroken if it healed incorrectly suggests a level of disregard to Cannon's serious medical need going beyond negligence and amounting to callousness.  Dr. Dehner's testimony demonstrates he knew that a delay in treatment would cause increased pain and suffering and could result in future surgery, but he did not think that was a problem.  A fact question exists whether the delay here rendered the care an unreasonable response to a serious medical need and so obviously inadequate as to support an inference of deliberate indifference.[56]

---

[56] *Wise v. Lappin*, 674 F.3d 939, 940-42 (8th Cir. 2012) (per curiam) (holding that jury could find medical staff acted with deliberate indifference to plaintiff's need for corrective jaw surgery based on defendants' two-month delay in referring plaintiff to a dentist, which ultimately resulted in plaintiff receiving oral surgery about two months after that, when plaintiff routinely complained of jaw pain and difficulties eating and had an obvious jaw deformity; one defendant requested copies of plaintiff's medical records, which plaintiff provided a week before the dental referral was made and which indicated plaintiff should be referred to an oral surgeon; and other defendant admitted plaintiff's jaw was "deformed, but told [plaintiff] that he was a 'holdover' inmate and should have received treatment [at his prior facility]"); *Nelson*, 603 F.3d at 444-45 (deliberate indifference based on fifty-day delay in treatment defendant prescribed); *Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004) (jury could find defendants were deliberately

A jury could find Dr. Dehner "knew of the serious medical need and w[as] deliberately indifferent to [Cannon's] need for prompt treatment."[57] Accordingly, Dr. Dehner is not entitled to summary judgment on Cannon's deliberate-indifference claim.

### 5. *Qualified Immunity*

Defendants argue that as they were not "deliberately indifferent to any serious medical need of Plaintiff," there is no "evidence that the Defendants violated a clearly established constitutional right," so "they are entitled to qualified immunity." Doc. 27-1 at 16. They do not offer any specific argument or citation on whether the right here was clearly established. Their entire argument consists of one page of boilerplate "qualified immunity" standard and their conclusion that Defendants were not deliberately indifferent and did not violate a clearly established right.

"To overcome the defense of qualified immunity, a plaintiff must show: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation."[58] As the court's analysis above demonstrates, the facts viewed in the light most favorable to Cannon show that Defendants were deliberately indifferent to a serious medical need, which is a violation of Cannon's Eighth Amendment rights. The court's cited cases also show that the right was clearly established.[59]

---

indifferent to inmate's serious medical need "when they failed to arrange for dental treatment until about six weeks after [inmate's] written request for it, causing him to suffer further pain and infection").

[57] *Wise*, 674 F.3d at 941.

[58] *McRaven v. Sanders*, 577 F.3d 974, 980 (8th Cir. 2009).

[59] *See also Allen v. Piepho*, No. 21-cv-02689 (SRN/ECW), 2023 WL 359596, at *8 (D. Minn. Jan. 23, 2023) (collecting cases holding that "unreasonable delay in providing the recommended treatment for a diagnosed broken hand" was clearly established in December 2017).

Accordingly, Defendants are not entitled to summary judgment based on qualified immunity.

### III.  CONCLUSION

The court **GRANTS IN PART and DENIES IN PART** Cannon's motion to strike (Doc. 43).

The court **GRANTS IN PART and DENIES IN PART** Defendant's motion for summary judgment (Doc. 27).  Cannon's claims against Defendants Kristoffer Karberg, Sally Potter, Amy Neuhaus, and Laura Barner are **dismissed with prejudice**.  Cannon's claims against Defendants Michael Dehner, Amy Shipley, Courtney Friedman, and Barbara Devaney remain.

**SO ORDERED** on April 14, 2023.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa

33